# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**BERNADINE E. MATTHEWS,**

**Plaintiff,**

v.                                                                    **Case No. 10-C-440**

**WAUKESHA COUNTY,**
**DEBBIE RAPP,**
**ABC INSURANCE COMPANY, and**
**XYZ INSURANCE COMPANY,**

**Defendants.**

---

# DECISION AND ORDER

---

The Plaintiff, Bernadine E. Matthews ("Matthews"), an African-American woman, filed this employment discrimination action against the Defendants, Waukesha County ("County") and Debbie Rapp ("Rapp"), a human resources assistant for the County (collectively the "Defendants"). Matthews claims that she was not hired for job vacancies as an Economic Support Specialist ("ESS") with the County Department of Health and Human Services ("HHS") in January 2006 and April 2006 because the Defendants discriminated against her on the basis of her race.

Matthews asserts violations of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e *et seq.*, against the County (first cause of action); 42 U.S.C.

§ 1981 against the County and Rapp (second cause of action); and the Equal Protection Clause of the Fourteenth Amendment under 42 U.S.C. § 1983 against the County and Rapp (third cause of action).

This Decision and Order addresses the Defendants' motions to strike portions of the Matthews declaration and attached exhibits, and the entire declarations of Rhonda Graves ("Graves"), and Lilley Wilson ("Wilson"), and to strike Matthews' expert witness Mary Gray ("Gray"), and their amended motion for summary judgment dismissing this action.

## MOTION TO STRIKE DECLARATIONS & EXHIBITS

The Defendants request that portions of Matthews' 31-page declaration consisting of 145 paragraphs, and exhibits 4 through 28, 31 through 47, and 49 through 52[1] attached to Matthews' declaration be struck.[2] They also request that the declarations of Graves and Wilson be struck.

The Defendants contend that a number of paragraphs in the Matthews declaration and the entire declarations of Graves and Wilson should be struck because they are not cited by Matthews in her response to the Defendants' proposed statements of fact ("PSOF") and Matthews' proposed findings of fact ("PFOF").

---

[1]The Defendants' initial motion sought to strike exhibits 2 through 52. However, in their reply brief, the Defendants withdraw their objections to exhibits 2, 3, 29, 30, and 48. (ECF No. 99.) The Defendants state the remaining exhibits fall into one of seven groups: (1) newspaper articles; (2) EEOC filings; (3) DOJ filings; (4) applications; (5) interview notes; (6) deposition summaries; and (7) County policies. They maintain that Matthews has failed to explain how she can authenticate the exhibits and, even if she could, to explain their relevance, and that many of them contain inadmissible hearsay.

[2]The Defendants do not move to strike paragraphs 1, 6, 7, 13, 14, 17, 18, or 31 of the Matthews Declaration (Defs. Mot. Strike Decl. Matthews, Graves & Wilson, 2.) (ECF No. 92.)

Case 2:10-cv-00440-RTR   Filed 03/28/13   Page 2 of 48   Document 101

Civil Local Rule 56(b)(9) states that collateral motions, such as motions to strike, are disfavored. The Committee Comment to the Rule also states that whenever possible all arguments relating to the other party's submissions should be contained in a memorandum. Furthermore, to the extent that an individual's averments are not cited or relied upon in proposed findings of fact, they are immaterial to the summary judgment process.

Additionally, Matthews states that exhibits 5, 6, 8, 10 through 12, 17 through 8, 20 through 24, 26, 35 through 45, and 48 to her declaration are also attached to the Kinne affidavit. The Defendants have not objected to those exhibits, and they are part of the record before the Court. For those reasons, the portions of the motions to strike that address evidence not material to the outcome of the motion for summary judgment are denied as moot.

Exhibits 4, 7, 27, 28, and 32 attached to the Matthews declaration are described as newspaper articles. Those exhibits are struck. *See Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (holding newspaper articles are hearsay.) With respect to the remainder of the exhibits – exhibits 1 (Matthews' employment application packet); 9 (a letter from the DOJ to Waukesha County), 13-16, 19 (employment applications), 25 (interview notes), 31 (County's response to DOJ),[3] 46 and 47 (employment applications); and 50 through 53 (deposition summaries prepared by Matthews), the Defendants offer a number of general objections. However, having considered Matthews' response to the motion and the lack of specificity of the motion, the Court declines to strike the remaining exhibits. Even if

---

[3]The Matthews declaration does not include exhibits that are designated as numbers 33 or 34.

3

Matthews has not established sufficient foundation for some of the exhibits, it is likely she could do so at trial and the evidence challenged as hearsay is not offered for the truth of the matter asserted.

The Defendants also object to paragraphs 34, 38 through 61, 69, 70, 112, 113, 115 through 122, 124, 125, 127, and 139 of the Matthews declaration on the grounds that they are "riddled with inadmissible hearsay and self-serving, irrelevant and inadmissible commentary, opinions and conclusory statements." (Defs. Mot. Strike Decl. Matthews, Graves, & Wilson 3.)

Under Rule 56, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). *Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003) holds that even self-serving affidavits can be enough to defeat summary judgment, provided that they allege facts (and not conclusions) and otherwise comply with Rule 56(c)(4). Although "self-serving statements in affidavits without factual support in the record carry no weight," *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 925 (7th Cir. 2004) (emphasis omitted), "a self-serving affidavit supported by facts in the record [can] defeat summary judgment," and the record "may include the self-serving affidavit itself, provided that the affidavit meets the usual requirements for evidence on summary judgment—including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there was a genuine issue for trial."

4

*Buie v. Quad/Graphics, Inc.,* 366 F.3d 496, 504 (7th Cir. 2004) (quotation marks and citations omitted).

Federal Rule of Evidence 401 provides that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401; *United States v. Boros,* 668 F.3d 901, 907 (7th Cir. 2012). "Rule 402 provides the corollary that, with certain exceptions, '[r]elevant evidence is admissible' and '[i]rrelevant evidence is not admissible.'" *Id.*; *see also* Fed. R. Evid. 402.

"Admissibility is the threshold question because a court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) (citing *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 533 (7th Cir. 2003) (inadmissible evidence will not overcome a motion for summary judgment). *See also Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996) (evidence relied upon at the summary judgment stage must be competent evidence of a type otherwise admissible at trial).

The Defendants also raise challenges under Rule 403, which provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." "[W]hile it is not unheard of to exclude evidence under Rule 403 at the summary judgment stage, *see, e.g.,*

5

*Weit v. Continental Ill. Bank & Trust Co.,* 641 F.2d 457, 467 (7th Cir. 1981), normally the balancing process contemplated by that rule is best undertaken at trial itself." *See Adams v. Ameritech Servs., Inc.,* 231 F.3d 414, 428 (7th Cir. 2000). At this juncture in the case, the Court declines to exclude any of the challenged evidence on Rule 403 grounds.

The Defendants ask that paragraph 34 of the Matthews declaration be struck. The paragraph states:

> After I filed the charge, [the] County changed its story. [The] County said I met the qualifications and I was referred. At the same time, [the] County was telling the EEOC that I did not meet the qualifications. To try to make me look unqualified, [the] County omitted my Associates Degree in Social Work from what it submitted to the EEOC. (That submission is attached as Exhibit 6). By giving this false submission, [the] County tried to make me look like I had only a Bachelors Degree, but that Julie Vetter had an Associates Degree and a Bachelors Degree. After I filed the charge, no one provided me with any information that my application was referred. I received nothing in writing or orally indicating that my application had been referred.

(ECF No. 88). Exhibit six to the Matthews declaration is a September 22, 2008, supplemental letter response from the County to the EEOC regarding Matthews' EEOC charge against it, and states that a copy of Matthews' "application and resume are attached" as exhibit four. (Ex. 6, 2.) (ECF No. 88-6.)

Matthews states that she relies, in part, on paragraph 34 to dispute paragraph 61 of the Defendants' PSOF which states that the County told Matthews her application would

6

be forwarded to the hiring authority.[4]  (Pl.'s Br. Opp'n Defs. Mot. Strike Decls. 3.) (ECF No. 98.)  Those portions of paragraph 34 stating that Matthews never received any notification from the County that her application had been referred are based on her personal knowledge and set out facts that would be admissible in evidence.  Therefore, the motion to strike is denied as to those portions of paragraph 34.

Matthews argues that in the "majority of" paragraphs 38 though 61 she cites to facts about which she has personal knowledge because most recite facts taken directly from the applications for the ESS position which, according to the County were the sole basis upon which the applicants were grouped.  She also states that she is using those facts to show the County's knowledge, not the truth of the matter asserted, so they are not hearsay.  She also states that her opinions in the paragraphs are admissible as lay opinions under Rule 701.

Paragraph 38 states that Matthews found many problems with Luann Page's ("Page") evaluation of the applicants.  As an example Matthews cites an application for the January 2006 ESS position she received from the Defendants' attorneys that contained personal information about the applicant.  In paragraph 38 Matthews suggests there is a connection between Page's evaluation of the applicants for January 2006 position and the Defendants' attorneys producing an application for that position without redacting personal

---

[4]Matthews also states that exhibit 6 is an admission of a party opponent which "indisputably" shows that the County did not inform the EEOC of her social work degree.  Matthews does not rely upon the rest of paragraph 34 of her declaration in opposing the Defendants' summary judgment motion, so that portion of the paragraph has not been  addressed.

information.  Paragraph 38 is based on speculation and conjecture and does not contain

admissible evidence, and may not be relied upon by Matthews.

Paragraph 39 recounts a conversation between Matthews and the applicant

referred to in paragraph 38, regarding disclosure of her personal information.  The paragraph

is hearsay, and it is also irrelevant to the discrimination claims in this action.

The Defendants' reply brief states that paragraphs 41 through 61 contain

Matthews' commentary on her perception of the level of experience of the referenced

applicants.  (However, paragraphs 41 through 61 include some facts drawn from Matthews'

review of 14 applications for the January 2006 ESS position, some conclusions she drew from

that review, her opinions as to whether that applicant should or should not have been referred

by Rapp and/or interviewed for the January position, and how she felt about how that applicant

was treated in comparison to her.[5])  Because Matthews received the applications from the

County she can provide limited foundation for them.  To the extent that Matthews extracted

information provided on an application, such as an applicant's degree or work experience, and

is using it to contest a placement of a particular applicant in a particular grouping, she is not

relying on the truth of the matter asserted, rather she is using the information to challenge the

County's groupings, and that portion of the paragraph would be admissible.  Matthews is also

competent to testify about her feelings regarding the treatment of others compared to her.

---

[5]Paragraph two of Matthews' PFOF cites paragraphs 38 through 61 of Matthews' declaration and states that "[m]ultiple black applicants were not grouped appropriately in comparison to the white applicants and in light of [the] County's stated grouped criteria."  The Defendants objected to the proposed findings in the course of their response to Matthews' PFOF.

However, Matthews' feelings are not relevant to any issue before this Court on summary judgment. The Defendants' motion is granted in part and denied in part as to paragraphs 38, 39, and 41 through 61 of the Matthews declaration.

With respect to paragraphs 112 and 139 of her declaration, Matthews asserts that the facts contained in those paragraphs are necessary to refute paragraph three of the Defendants' PFOF of fact regarding her litigation history. She notes that she has moved to strike that proposed fact. The list of lawsuits is irrelevant under Rule 401 of the Federal Rules of Evidence, and the Court has not included that list in its statement of the relevant facts. Therefore, paragraphs 112 and 139 of the Matthews declaration are irrelevant, and will be struck.

With respect to paragraph 113, Matthews states she was responding to paragraph four of the Defendants' PSOF which she states insinuates that she lied about not being able to work in 1996. She also moved to strike the proposed fact. The underlying cited material, (Doyle Aff. ¶ 12, Ex. 18 (Matthews Aff. filed on Apr. 13, 2007, in *Matthews v. Wisconsin Energy Corp.,* No. 05-C-537 (E.D. Wis.)) ¶ 7) (ECF Nos. 70, 70-11), states that Matthews' physician placed her on a permanent medical restriction that forbids her from working in excess of 20 hours per week, and that the restriction is the result of injuries to her neck in 1996. The fact bears on Matthews' qualifications to work the full-time ESS job and, therefore, is relevant. Matthews' statement in paragraph 113 that she only understood that restriction to relate to a call center job at Wisconsin Gas and that since that time she has worked full-time

9

is also relevant and admissible. Neither the proposed finding of fact nor paragraph 113 of Matthews declaration will be struck.

Matthews states that paragraphs 115 through 122 and 124 through 127 of her declaration are presented to oppose paragraph five of the Defendants' PSOF. Matthews has also moved to strike that proposed statement of fact as irrelevant and unfairly prejudicial. Paragraph five of the Defendants' PSOF states that Matthews claims emotional distress related to events in this case and litigation, and that she made such a claim in another lawsuit in this District, and that Matthews has a $740,032 judgment against her which is not causing her emotional distress. Matthews' motion to strike is granted as to the portions of Defendants' proposed statement of fact regarding her prior lawsuits. *See e.g. Mathis v. Phillips Chevrolet, Inc.,* 269 F.3d 771, 775 (7th Cir. 2001). The proposed statement of fact is a thinly disguised argument and is not relevant to any issue presented on summary judgment. Matthews has personal knowledge as to what has and has not caused her distress. Therefore, paragraphs 115 though 122 and 124 through 127 of her declaration will not be struck.

The Court has addressed the Defendants' objections to the critical paragraphs of the Matthews' declaration. However, they are reminded that such objections are most helpful when raised in the context of the summary judgment motion. Therefore, the Defendants' motion to strike is granted as to portions of paragraphs 38 through 61, and paragraphs 112 and 139 of Matthews' declaration, and exhibits 4, 7, 27, 28, and 32 and denied in all other respects.

10

## MOTION TO STRIKE GRAY AS AN EXPERT WITNESS

The Defendants also move to strike Gray as an expert witness contending that her methods are not reliable and the evidence is not relevant. (ECF No. 89.) Grey is a statistician and a full professor of mathematics and statistics at American University. She prepared an expert report, (ECF No. 82-8), and was deposed on September 2, 2011. (ECF No. 83-14.)

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 588 (1993). Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The court of appeals for this circuit has outlined a three-step analysis for determining whether the expert testimony is both relevant and reliable: "[T]he witness must be qualified 'as an expert by knowledge, skill, experience, training, or education,' Fed. R.

11

Evid. 702; the expert's reasoning or methodology underlying the testimony must be scientifically reliable, *Daubert*, 509 U.S. at 592-93, . . . and the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702." *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007).

In determining reliability, courts are to consider the following non-exhaustive list of guideposts: "(1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the theory has been generally accepted in the scientific community." *Id.* (citing *Daubert,* 509 U.S. at 593-94). "The proponent of the expert bears the burden of demonstrating that the expert's testimony satisfies the *Daubert* standard," by the preponderance of the evidence. *Lewis v. CITGO Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir. 2009). The weight and credibility of an expert's testimony may be challenged through "[v]igorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

"Anyone with relevant expertise enabling [her] to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000). The Court's focus is on whether Gray's opinion is based on a reliable method, not on a method that the Defendants deem to be most reliable. *See Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1020 (7th Cir. 2000) (stating "[o]ur case law has recognized that experts in various fields may rely properly

12

on a wide variety of sources and may employ a similarly wide choice of methodologies in developing an expert opinion.").

A number of Seventh Circuit decisions address the admissibility of expert statistical evidence. *See e.g., Kadas v. MCI Systemhouse Corp.,* 255 F.3d 359, 363 (7th Cir. 2001) (based on evidence of a trained statistician, the judge decides whether such evidence is of the particular significance level to be admissible); *Bell v. EPA*, 232 F.3d 546, 553 (7th Cir. 2000) (valid statistical analysis must encompass the relevant labor market). Unfortunately, the Defendants' objections to Gray's opinions are not presented in the context of that case law.

Statisticians typically calculate the standard deviation from the norm to determine the likelihood that race played no role in a decision. *See Adams,* 231 F.3d at 424. Generally, statisticians believe that two standard deviations is enough to show that a result is unlikely (less than a 5% probability) to be the result of chance; i.e., that the result is "statistically significant." *Id*. The Seventh Circuit has rejected the idea that any study is inadmissible as a matter of law just because it is less statistically significant than the usual two standard deviations. *Kadas,* 255 F.3d at 362.

The Defendants contend that Gray should not have used the Fisher exact test. However," [w]ell known small-sample techniques include the sign test and Fisher's exact test." David H. Kaye, David E. Bernstein and Jennifer L. Mnookin, *The New Wigmore: Expert Evidence*, § 12.8.4 Evaluating Hypothesis Tests, 566 n.42 (Wolters Kluwer 2d ed. 2011),

13

citing Michael O. Finkelstein & Bruce Levin, *Statistics for Lawyers* 154-156, 339-341 (2d ed. 2001) and citing generally *E.L. Lehmann & H.J.M. d'Abrera, Nonparametrics* (2d ed. 2006).

Gray stated that the Fisher exact test measures how likely a result is to have occurred by chance. (Gray Dep. 79.) Gray testified, referring to her results, that within the professional category "you would end up with 4.8 percent of blacks in PMSA [Primary Metropolitan Statistical Area] and only .9 percent in the Waukesha County workforce and the probability of having that big of a difference by chance is one in a thousand. Whereas in the case of officials, the difference is still pretty large. It's 4.4 and 1.4." (*Id.*)

The Defendants also assert that Gray has identified the wrong relevant market. Determining the relevant labor market is an essential step in determining whether there are any statistically significant deviations between the market and the employer's hiring patterns. *E.E.O.C. v. O & G Spring & Wire Forms Specialty Co.,* 38 F.3d 872, 876-77 (7th Cir. 1994) (citing *E.E.O.C. v. Chicago Miniature Lamp Works,* 947 F.2d 292, 299-300 (7th Cir 1991)). However, in *O & G Spring,* the expert "provided three different formulations of [the] relevant labor market, each with a slightly different geographic or occupational scope." 38 F.3d at 877. The district court did not choose between the different formulations but found that they presented a sufficiently accurate range against which the court could evaluate the company's hiring record. *Id.* Gray relied on the relevant market as being Milwaukee Waukesha, Wisconsin PMSA based on the information she was provided. (Gray Dep. 76.) Gray's methods are sufficiently reliable, and the evidence is relevant to Matthews' discrimination

14

claims. Any weaknesses in Gray's opinions could be explored through cross-examination and other means available to them. Therefore, the Defendants' motion to strike Gray as an expert witness is denied.

## Summary Judgment Standards

An initial question is whether there is a genuine dispute of material fact precluding resolution of this action upon summary judgment. In making that determination, the Court applies the following criteria to the parties' proposed statements of material fact.

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, "[a] party may move for summary judgment, identifying each claim . . . on which summary judgment is sought." This Court must view the facts in the light most favorable to the non-movant, resolving all evidentiary conflicts in her favor and according her the benefit of all reasonable inferences that may be drawn from the record. *See O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). However, a court's favor toward the nonmoving party does not extend to drawing "[i]nferences that are supported by only speculation or conjecture." See *Singer v. Raemisch,* 593 F.3d 529, 533 (7th Cir. 2010) (quoting *Fischer v. Avanade, Inc.,* 519 F.3d 393, 401 (7th Cir. 2008)).

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Put another way,

15

summary judgment is appropriate when there are no genuine factual issues that could lead a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Although the moving party bears the initial burden of informing the Court of the basis for its motion, it may satisfy its burden by simply showing or pointing out to the Court that there is an absence of evidence supporting the non-moving party's case. *Celotex,* 477 U.S. at 325. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to withstand summary judgment. *See Anderson,* 477 U.S. at 252.

Summary judgment is not a substitute for a trial on the merits or a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994). But if it is clear that the non-movant will be unable to establish an essential element of [her] claim, summary judgment is not only appropriate, but mandated. *Massey v. Johnson,* 457 F.3d 711, 716 (7th Cir. 2006) (citing *Celotex,* 477 U.S. at 322-23).

### Relevant Facts[6]

Matthews submitted an application to the County on about January 13, 2006 for the position of ESS. The County is a public government agency. The Milwaukee Journal Sentinel ad for the ESS position specifically stated "NO RESUMES PLEASE." Matthews also applied for a separate job opening of Economic Support Supervisor ("Supervisor").

---

[6]The relevant facts are based on the Defendants' PSOF and Matthews' PFOF to the extent that they are undisputed. Citations to all quoted excerpts, including undisputed facts, are provided. The word "dispute" followed by a party's citation to its own proposed finding of fact does not comply with Civil Local Rule 56(b)(2)(B)(i).

16

Supervisors manage the ESSs within the HHS. Unlike the ESS position which required only an application, the Supervisor position required applicants to submit a formal resume. Matthews submitted a resume and cover letter for the Supervisor position. The application deadline for both positions was January 13, 2006.

The resume and cover letter submitted by Matthews for the January 2006 Supervisor position would have been provided to Renee Gage ("Gage"), the Senior Human Resources Analyst handling the recruitment for that position. Matthews was not hired for either the January 2006 ESS position or the January 2006 Supervisor position. This action relates only to the ESS position as Matthews has dismissed her claim against Gage and her claim related to the Supervisor position.

## A. Economic Support Specialist

A County ESS works with individuals and families with minor children to evaluate, calculate and determine eligibility for public or economic assistance programs. Responsibilities include working with and/or evaluating specific public and economic assistance programs including FoodShare, Medical Assistance, ChildCare, ChildSupport, or W-2. The ESS job description sets forth general duties. However, the specific day-to-day duties of an ESS worker and the assistance programs handled by an ESS employee were dependent on the site where the ESS worker was placed. In 2006, ESS workers were assigned to either the Workforce Development Center or the Human Services Center.

The January 2006 position and the April 2006 position were based in different locations. Julie Vetter ("Vetter"), who was hired for the January 2006 position, worked at the Workforce Development Center. Princella Turner ("Turner"), who was hired for the April 2006 position, worked at the Human Services Center.

## B. January 2006 ESS Opening

In December 2005, an ESS employee informed the County that she was leaving her employment, which created one ESS position opening. Supervisor Luann Page ("Page") supervised that employee and, therefore, was responsible for coordinating the hiring process and ultimately making a hiring decision. When the Human Resources Department was informed of the ESS opening, Rapp, a Human Resources assistant, posted the ESS position and advertised the position in the newspaper.

## C. Applications for the Economic Support Specialist Position

The County received 132 applications for the ESS position. Applications were received and date-stamped by Debra Ware ("Ware"), a clerk typist in the Human Resources Department, and then given to Rapp, who handled recruitments for seasonal job openings and entry-level positions, including the ESS position. Non-entry level positions would be handled by a Senior Human Resource Analyst such as Gage.

## D. Voluntary Affirmative Action Program ("AAP") Form Filled Out By Applicants

Applicants for the ESS position were given the option of completing a separate AAP form, which asked, among other things, how the applicant learned about the position and

18

the applicant's race. The AAP form indicated that the information being requested was voluntary. Matthews chose to complete the AAP form and disclosed her race as African-American. Rapp only reviewed the AAP forms to determine how each applicant found out about the position.

### E. Evaluation of Minimum Qualifications by Rapp

Rapp's duties included reviewing all ESS applications to determine whether each applicant met the minimum training and experience requirements for the position. The written job description for the ESS position delineated the minimum qualifications under "Training and Experience" which stated:

> (1) High school graduation or GED (General Education Development) equivalent.
> (2) Three (3) years of post high school work experience in financial counseling, counseling in a human service agency or related work experience.
> (3) Accredited post high school education may be substituted for the work experience on a year to year basis up to two (2) years.

(Page Aff. ¶¶ 4-8, (Ex. 7.) (ECF Nos. 67, 67-1.) Each application contained information about the applicant, including his or her educational background and employment history.

Rapp returned the screened applications to Ware, who examined the applications to see whether Rapp had written "refer" or "no T & E" on the bottom portion of each application. "No T & E" applications were set aside to be sent rejection letters (also referred to as "no T&E letters") within a day or two. (*See* Pl.'s PFOF ¶¶ 10 & 14.) Matthews received a rejection letter dated January 18, 2006. Applications marked "refer" were copied by the

19

Human Resources Department, and the copies were forwarded to the supervisor who was filling the position. Information at the bottom of the first page relating to referral was not copied because the hiring department had no need for that information. (Gage Dep. 27.) (ECF No. 83-13.) The AAP form, if completed by the applicant, was also removed from the application before it was forwarded, and cover letters were not included.[7] The original applications, AAP forms, and any resumes or cover letters were then filed in the Human Resources Department. The "no T & E" applications, with rejection letters attached, were filed with the other applications.

An individual who applied for both the ESS and the Supervisor positions would be required to fill out an application for the ESS position and submit a formal resume for the Supervisor position. Any resume and any cover letter submitted for the Supervisor position would be forwarded to Gage, who handled recruitment for the Supervisor position. Rapp would not have seen Matthews' resume, even if one had been submitted.[8]

The minimum ESS qualifications were found to be satisfied by 87 of the 132 applicants, and their applications were forwarded to Page for evaluation. The applications did not contain any information as to the applicants' race. After the applications were forwarded to Page for evaluation, Rapp had no further role in the January ESS hiring process. Rapp did not participate in the grouping of applications, the decision as to who to interview, or the

---

[7]There is a dispute regarding whether any resumes that were submitted were forwarded to the hiring authority. (*See* Pl.'s Response to Defs. PSOF ¶ 37.) (ECF No. 80.)

[8]The foregoing is an undisputed fact. (*See* Pl.'s Response to Defs. PSOF ¶ 41.)

decision as to who to hire. No one involved in the hiring process for the January 2006 ESS position had, or ever requested, any information as to an applicant's race.

**F. Creation of Groupings By Page**

Due to the large number of ESS applicants who met minimum qualifications, Page decided to group the applicants to determine those who had extensive and very recent relevant experience pertinent to the position. When creating the groupings, Page focused on recent experience relating to economic assistance programs rather than the type and number of degrees and certificates.

The interview selection process and ultimate hiring decisions were based on trying to find the most qualified individual for the position. Some type of grouping or categorization of applicants, given a large applicant pool, had been utilized by the County in the past.

Page recalled that at some point during the process of creating the groupings she consulted with Sue Schmitz ("Schmitz"), the Economic Support Coordinator, as to relevant job characteristics and/or the groupings. Page created four general groups based on the relevant characteristics for the position. Group one was applicants who had recent work experience (in one to two years of the last two years) in determining eligibility for the FoodShare, Medical Assistance, and ChildCare programs. Group two was those applicants who had experience with, but had not determined eligibility for, W-2, ChildSupport, and ChildCare. Group three consisted of applicants who had recent experience working with

21

clients in a county agency or community social work setting. Group four was those who had

experience in interpreting program policy or working with the public in the role of public

relations or similar experience. After the groups were created, Page reviewed the applications

and placed each applicant into a group based on work experience. Page did not know the race

of the applicants, and did not know Matthews prior to her application with the County in 2006.

## G. Matthews' Application

Matthews submitted her cover letter, application, resume, and AAP form to the

County in person on Friday, January 13, 2006, and Rapp saw Matthews' application for the

first time that day. The letter and resume would have been provided to Gage for the

Supervisor position.

Upon her initial evaluation of Matthews' application, Rapp did not believe that

Matthews met the minimum qualifications for the position based on Rapp's understanding of

Matthews' employment responsibilities as a commercial service representative at Wisconsin

Gas. The January 18, 2006, rejection letter informed Matthews that she did not meet the

minimum requirements for the ESS position, and invited her to contact Rapp if she had

"additional information" to bring to Rapp's attention. After receiving the letter Matthews

called the County and spoke to Rapp, inquiring why she did not qualify for the ESS position.

Matthews recalls calling Rapp on January 23, 2006. (Matthews Decl. ¶ 7.) (ECF

No. 88.) Matthews said she believed she was qualified, and said to Rapp, "I don't understand

how I don't meet the minimum training and experience requirements." (*Id*. at ¶ 13.) During

22

that telephone call, Matthews provided additional information and an explanation about her work experience. With this new information, Rapp placed Matthews on hold and consulted with Gage calling upon her experience as a Senior Human Resources Analyst.[9]

After her phone conversation with Matthews, Gage telephoned Page and told her that an additional application for the ESS position was being forwarded to her for consideration.[10] Page was never told the race of this applicant. Page recalls receiving Matthews' application for consideration at the time, or shortly after, the first interviews were conducted. She also recalls thinking that she might have to schedule another interview depending on the applicant's qualifications and grouping.

Page did not schedule Matthews for an interview because her application did not fit within group one, the category of applicants being interviewed. Based on the work experience listed on her application, Page placed Matthews in group four. While Matthews

---

[9]There is a genuine factual dispute about what Rapp told Matthews. According to Matthews, she was told the ESS position and the Supervisor position were filled. (Pl.'s PFOF ¶ 39-42.) Matthews also states that she asked if other positions would be open, and Rapp told her that ESS openings were rare and she would have to check periodically. (*Id.* at ¶ 42.) Matthews also maintains that Rapp did not tell her about recruitment cards, (*Id.*), and that she was never told her application would be forwarded to the hiring authority for consideration. (Pl.'s Resp. Defs. PSOF ¶ 61-62.) (ECF No. 80.)

According to the Defendants, after consulting with Gage, Rapp told Matthews that her customer service information would be qualifying and her application would be referred. (Defs' PSOF ¶ 61-62.) (ECF No. 78.) Furthermore, Rapp states that she would not have told Matthews that the Supervisor position was filled because she did not have that knowledge. (Defs' Resp. Pl.'s PFOF ¶ 41.) (ECF No. 96.) The Defendants also state that Rapp does not believe she told Matthews that ESS positions do not open very often. (*Id.* at ¶ 42.) The Defendants further maintain that if Matthews asked about future openings, she would have told that she would have to initiate an application to be considered and that she could fill out a recruitment card, check the vacancy listing, or check the hotline. (*Id.*)

[10]Matthews asserts that Gage denies she spoke to Page, citing paragraph 97 of her PFOF, which relies on page 18 of Gage's August 23, 2011, deposition, where Gage testified that she did not play any role in the grouping, interviewing, or hiring for the January 2006 position. Gage's testimony does not address whether she spoke to Page about the additional application coming to her and, therefore, Matthews has not raised a factual dispute.

23

had experience working with the public, she had no experience in determining eligibility for FoodShare, Medical Assistance, Child Care, W-2 or Child Support so as to place her in groups one or two, nor did she have experience working with clients in a county agency or community social setting so as to place her in group three.

## H. Interviews of Applicants in Group One

After the grouping of the applicants was completed, those placed in group one were contacted for an interview. If a candidate from group one was felt to be right for the job, he or she would be offered the position. If that candidate accepted, the process would end. If a candidate was not found in group one, all applicants in group two would be interviewed. If a candidate was not found in group two, those applicants in group three, and then group four, would be interviewed.

Interviews were conducted on January 25, 30, and 31 and February 2, 2006, by Page, Schmitz, and Economic Support Supervisor Patricia McElroy-Komppa ("McElroy-Komppa"), who participated in some of the interviews when she filled in for Page because of sickness. Each of the interviewees was asked the same questions.

After all the scheduled interviews for group one were completed, a job offer was extended to Vetter (who is white) on February 2, 2006. It is routine for Page to "want to get people in and be fully staffed." (Page Dep. 34.) (ECF No. 83-18.) She agreed with the statement that she "wanted to get this hiring process done as quickly as the circumstances would allow" (*Id.*) Vetter accepted the offer and began employment on February 6, 2006.

24

Because a candidate was found in the group one interviewer, the hiring process for the January ESS opening ended. Vetter was hired because of her approximately seven years of recent and relevant work experience in California, first at San Joaquin County Human Services Agency and then at Calaveras Calworks and Human Service Agency, where she determined eligibility for comparable public assistance programs in California. Her references checked out, and she provided recent evaluations that were excellent. Vetter also exhibited knowledge of program policy, computer proficiency, and understood the value of customer service. It was believed that her knowledge of California's programs would enable her to handle a caseload sooner than a person without previous economic support experience.

## I. April 2006 ESS Recruitment

In approximately April of 2006, a second ESS position became available. At some point, the Human Resources Department was informed of another opening for an ESS position. Because of its temporal closeness, all applications from the January recruitment were forwarded for review.

Applicants from the January 2006 recruitment (who met the minimum qualifications) and new applications received for the April 2006 recruitment (who met the minimum qualifications) were forwarded to McElroy-Komppa for evaluation, and she made the decision about which applicants to interview. McElroy-Komppa did not "specifically recall" getting Matthews' application. (McElroy-Komppa Dep. 57.) (ECF No. 83-16.) The

25

recruitment date for the position was April 17, 2006. Matthews was still interested in the ESS job at the time of the calls to groups two and three with respect to the April position.

McElroy-Komppa did not focus on education, but rather on recent experience to determine who to interview. She looked for individuals who had experience in determining eligibility for public assistance programs, preferably individuals who had experience in economic support programs or other related need-assistance programs. She also looked for experience with personal interviews, such as those to determine eligibility for energy assistance payments. The more interviewing experience, the more positive it would be for the applicant.

The County contacted applicants in groups two and three from the January 2006 process. Five applicants were scheduled for interview: three African-Americans, one white, and one Hispanic. Prior to the interviews, McElroy-Komppa did not know the race of any applicant.

McElroy-Komppa contacted the applicants and scheduled the interviews for the April 2006 position. Maria Rivera ("Rivera"), Debra Thompson ("Thompson") and Turner, an African-American, were interviewed for the ESS position that ultimately went to Turner. Rivera (Hispanic) was placed in group two in the January hiring process, and Thompson (African-American) was placed in group three. An offer was made to Turner because it was believed she was the most qualified for the position. Turner's hire date was July 17, 2006.

### J. Matthews' Qualifications

At the time Matthews applied for the ESS job, she was working about 20 hours per week. In a 2007 filing in federal court, Matthews reported that her physician had placed her on a permanent medical restriction prohibiting her from working in excess of 20 hours per week as a result of injuries she sustained to her neck in 1996.

In her application Matthews indicated that she had a Bachelor of Science degree in Criminal Justice from UW-Milwaukee and that she was certified in Human Resources Management by Cardinal Stritch University. She listed the following work history:

> Midwest Connect Airlines: 6/03 to Present, 20 hrs/week
> Job Title: CSR-Gate Agent
> Duties: CSR/Gate Agent-Checking Passengers in for flights, boarding, planes, handling delays
>
> Wisconsin Gas Company: 9/9/80 to 4/26/99, 40+ hrs/week
> Job Title: Commercial Service Rep-Customer Service Representative
> Duties: Commercial Service Representative, negotiated payment plans, assisted low income families-referrals-verified income information.
>
> Wisconsin Correction Services: 8/01 to 12/01, 20+ hrs/wk
> Job Title: Pretrial Services, Representative, Failure to Appear Unit
> Duties: Internship-Failure to Appear Unit

In the "Description of Duties" box for the Wisconsin Correction Services position Matthews referred the County to her resume. Matthews also indicated in her application that she had strong interviewing skills and social work experience.[11]

---

[11]Paragraphs 33 and 34 of Matthews' PFOF are based on information contained in Matthews resume. However, there is no evidence that Rapp or Page ever saw Matthews resume. Therefore, the proposed findings are not relevant and have not been included.

**K. Vetter Qualifications**

Vetter's application consisted of the following work history covering the previous almost-seven years:

Calaveras Calworks and Human Service Agency: 2/04 to 10/05, 40 hrs/wk
Job Title: Eligibility Worker II
Duties: Determine eligibility for Medical and County Medical Services Program primarily at Intake level. General Assistance Work Program Coordinator. Interview, discuss regulations, and address client requests. Initial case set up, case comments and documentation of eligibility verifications. Refer clients to outside agencies as needed.

Calayeras Calworks and Human Services Agency: 3/02 to 6/03, 40 hrs/wk
Job Title: Eligibility Worker II
Duties: Determine initial and ongoing eligibility timely for Food Stamps, Medi-Cal and County Medical Services Program. Some add program applications for TANF [Temporary Assistance for Needy Families] also. Address emergency requests, interview, document case record, process eligibility reports, refer clients to other agencies as appropriate.

San Joaquin County Human Service Agency: 2/00 to 12/00, 40 hrs/wk
Job Title: Eligibility Worker II
Duties: Determine public assistance timely for TANF, Food Stamps and Medical at initial intake level. Interview clients, obtain documentation to support eligibility determination, address emergency requests, discuss regulations with clients. Document case file with case comments and number of months of cash assistance used.

San Joaquin County Human Services Agency: 3/96 to 6/99, 40 hrs/wk
Job Title: Eligibility Worker I (1996) and II (1997-1999)
Duties: Determine public assistance timely for TANF, Food Stamps and Medical at initial intake level. Interview clients, obtain documentation to support eligibility determination, address emergency requests, discuss regulations with clients. Document case file with case comments and number of months of cash assistance used.

28

## L. Turner's Qualifications

Turner's application listed the following information under Employment History:

> Aurora Health Care: 11/04 to Present, 40 hrs/wk
> Job Title: Medical Assistant
> Duties: [A]ssist doctors in office, procedures and vitalizing patients;

> State of Arkansas: 1/02 to 9/04, 40 hrs/wk
> Job Title: Family Support Specialist
> Duties: [D]enied or approved applications for public assistance.
> [A]ssisted and encouraged clients to become self supporting;

> St. Michael Hospital: 12/91 to 12/01, 40 hrs/wk
> Job Title: Prenatal Coordinator and Medical Assistant
> Duties: [F]ollowed high risk ob patients through pregnancy. [A]ssisted them in
> getting insurance and other personal issues that may prevent them from coming
> to appointment.

Turner indicated on her application that she left her position of Family Support Specialist with the State of Arkansas because she got married and moved to Milwaukee.

On February 10, 2006, Matthews filed a charge with the EEOC alleging that she had been the victim of race discrimination when she was not contacted for an interview for either the ESS or the Supervisor position. Richter received Matthews' EEOC charge a couple of months before Turner was hired and spoke about it with Gage, Rapp, and Page, telling them it was about race discrimination. McElroy-Komppa recalled that Schmitz, and perhaps Page, told her about a racial discrimination complaint concerning the ESS position. However, she could not recall when she received this information. (McElroy-Komppa Dep. 20-22.)

On July 29, 2009, the EEOC sent Matthews a determination stating:

29

> I have considered all the evidence disclosed during the investigation and find that there is reasonable cause to believe that there is a violation of Title VII in that Respondent [Waukesha County] discriminated against a class of Black applicants, including the Charging Party, when they were excluded from consideration for the Economic Support Specialist position and thus, denied hire.

(Kinne Aff., Ex. 5.) (ECF No. 82-5.)

Matthews filed this action on May 21, 2010, alleging that she was discriminated against on the basis of race when she was not hired for the ESS position in 2006.

Allyce Lilley ("Lilley"), has been employed by the County as a Deputy Clerk Supervisor/Circuit Court Supervisor since July 28, 1998. In Lilley's role as a Circuit Court Supervisor, she has never grouped applicants nor has she provided internal candidates with courtesy interviews.

In 2010, the United States Department of Justice ("DOJ") initiated an investigation as to the hiring practices relating to the following positions in the County government: Deputy Sheriff, Maintenance Mechanic and Telecommunicator. (Richter June 14, 2012, Dep. 79-80.) (ECF No. 83-21.) The investigation did not concern the ESS position. In early June 2012, the County was informed that the DOJ was no longer pursing the investigation. (*Id*. at 81.)

In 2006, Richter was the County's labor relations manager, and his job responsibilities included collective bargaining, employee relations, grievances, employee

30

benefits, human resources information systems, and management of the day-to-day employee relations issues with departments.

The County policy states:

**2430 Review of Applicant Qualifications** All employment applications and resumes for vacant positions are reviewed by the Human Resources Division to ensure that the applicant meets the minimum training and experience requirements established by the County Board for that classification. Applicants who do not meet the requirements will not be allowed to proceed further in the employment process.

(Kinne Aff. Ex. 10, EEOC 8) (ECF No. 82-10).

With respect to the January 18, 2006, rejection letter to Matthews that invited her to contact Rapp if she had any additional information to bring to Rapp's attention, Richter explained this practice as follows:

The practice is that individuals, if they're determined not to meet the minimum qualifications, they're advised by [sic] that by a letter – now it's by an email – and if they have additional information for us to consider, they have the opportunity to provide that to us. Once that information is provided to us, we evaluate the information. And if it's determined that they now meet the minimum qualifications, then their applications are referred for further consideration.

(Richter June 14, 2012, Dep. 147-48.)

In 2006, a position applicant could fill out a recruitment card that would be kept on file. Even if there was no active recruitment, an applicant could complete a card. The card listed the applicant's address and the position in which he or she was interested. There was no policy that every applicant who filled out an application be given a recruitment card. Ware

31

provided the cards and maintained them in a filing cabinet in the Human Resources Department. Ware would forward recruitment cards at the beginning of a recruitment if they were requested by an analyst. Rapp played no role in providing recruitment cards.

In 2006, to recruit minorities the County sent out weekly vacancy announcements to community agencies, placed notices online, and sent notices to state agencies. In 2006, the County recruited in Milwaukee County and the whole "inter-region." (Richter Oct. 3, 2011, Dep. 8.) (ECF No. 83-20.)

Gray, Matthews' expert, has determined that for the time period relevant to this case there is a statistically significant difference in the proportion of African-Americans in the County workforce as compared with their employment in the relevant PMSA. According to her, the proper labor market to consider is the Milwaukee-Waukesha, Wisconsin PMSA. Gray has determined that for 2005, in six out of eight job categories, there was a statistically significant difference between the percentage of African-Americans in the PMSA and the percentage of African-Americans in the County workforce. Those six job categories are: professionals, technicians, protective services/operatives, office/clerical, service/maintenance v. service, and service/maintenance v. service plus laborers. According to Gray, chance could not explain the shortfall of African-Americans in those categories, nor could it explain the overall shortage of African-Americans in the County workforce. Gray also maintains that the two categories (officials and skilled craft) in which no statistical difference existed are not categories that would apply to the ESS position.

32

According to Defendants' expert, Dr. Mary Dunn Baker ("Baker"), Gray's workforce analysis fails because the data source she used to measure African-American availability for County jobs—the EEOC's 2005 EEO-1 Aggregate Report for the Milwaukee-Waukesha, Wisconsin PMSA is not appropriate. Baker also indicates that Gray simply compared the Milwaukee-Waukesha PMSA with the racial make-up of the Waukesha County workforce in 2005. Gray did not consider or do a statistical analysis of the ESS position for 2006 to 2011, the position at issue in this case.

### Analysis

The Defendants assert that Matthews cannot establish that she was discriminated against because of her race and, therefore, her claims must be dismissed upon summary judgment. Matthews counters that she can prevail on her Title VII and § 1983 race discrimination claims under either the direct or indirect method of proof. Matthews' brief does not mention her § 1981 claims or her § 1983 claim against the County.[12] Therefore, those claims are dismissed.

---

[12]When a party so inadequately and perfunctorily develops a claim, that claim or series of claims are waived. *See Lim v. Trustees of Ind. Univ.*, 297 F.3d 575, 581-82 (7th Cir. 2002) (citing *Muhich v. Comm'r of Internal Revenue*, 238 F.3d 860, 864 n.10 (7th Cir. 2001)) (regarding appeals); *Colburn v. Trs. of Ind. Univ.*, 973 F.2d 581, 593 (7th Cir. 1992) (passing mention of § 1983 and no mention of Defendant on appeal).

Matthews' failure to hire claims are premised on alleged racial discrimination in violation of Title VII,[13] and § 1983.[14] *See Swearnigen-El v. Cook Cnty. Sheriff's Dept.*, 602 F.3d 852, 860 n.6 (7th Cir. 2010). Courts apply the same standards for establishing race discrimination under Title VII, § 1981, § 1983. *See id* (regarding Title VII and § 1981 claims); *see also, Bender v. Bellows & Bellows*, 515 F.3d 757, 768 n.7 (7th Cir. 2008) (regarding Title VII and § 1983 equal protection claims.)

A plaintiff can prove discrimination under Title VII by using either the direct or the indirect method of proof. *Darchak v. Chi. Bd. of Educ.*, 580 F.3d 622, 630 (7th Cir. 2009). In any employment discrimination case, the central question is "whether the employer would have taken the same action had the employee been of a different race (age, sex, religion, national origin, etc.) and everything else had remained the same." *Moranski v. Gen. Motors Corp.*, 433 F.3d 537, 540 (7th Cir. 2005) (quotation marks and citation omitted).

Under the direct method, a plaintiff must produce either direct or circumstantial evidence that would permit a jury to infer that discrimination motivated an adverse employment action. *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527 (7th Cir. 2008). Direct evidence is something close to an explicit admission by the employer that a particular decision was motivated by discrimination; this type of evidence is rare, but it "uniquely

---

[13]Title VII makes it unlawful for an employer "to fail to refuse to hire . . . or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

[14]Pursuant to 42 U.S.C § 1983, individuals have a private right of action against state officials or municipalities for violations of the Fourteenth Amendment.

reveals" the employer's intent to discriminate. *See Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005). More common is circumstantial evidence, which "suggests discrimination albeit through a longer chain of inferences." *Hasan*, 552 F.3d at 527 (internal citation omitted).

A plaintiff can survive summary judgment by producing either type of evidence as long as it creates a triable issue on whether discrimination motivated the employment action. The Seventh Circuit has identified three categories of circumstantial evidence: (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination. *Darchak*, 580 F.3d at 631. A plaintiff need not produce evidence in each category to survive summary judgment. *See id.* at 632.

Matthews has presented no direct evidence, which "essentially requires an admission by the decision-maker that [her] actions were based on the prohibited animus." *Koszola v. Bd. of Educ. of City of Chi.*, 385 F.3d 1104, 1109 (7th Cir. 2004) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000)). However, a "plaintiff can also prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that allows a jury to infer intentional discrimination by the

35

decisionmaker. That circumstantial evidence, however, must point directly to a discriminatory reason for the employer's action." *Koszola,* 385 F.3d at 1109 (quoting *Rhodes v. Ill. Dep't of Transp.,* 359 F.3d 498, 504 (7th Cir. 2004))

Matthews asserts that she has sufficient circumstantial evidence to establish a direct case of hiring discrimination. In so contending, Matthews asserts that: (1) Rapp rejected her application while simultaneously referring numerous white applicants who lacked the minimum qualifications for the job; (2) Rapp knew the race of the applicants, but at first attempted to deny knowing Matthews' race; (3) Rapp lied to her about the position being filled and tried to discourage her from continuing in her search for employment; (4) Rapp denied that she falsely told Matthews that the position was filled; (5) Rapp never forwarded Matthews' application to Page and, even if she did, the initial delay prevented Matthews' application from being considered with the first group of applications and the subsequent delay, after speaking to Gage, prevented Page from receiving Matthews' application until after the interviews began; (6) Gage told Page of the initial decision not to refer Matthews, placing Matthews at a disadvantage because Matthews' application was late and Page knew it was late because Rapp initially concluded that Matthews lacked the minimum qualifications; (7) Page placed Matthews in group four without evaluating Matthews' application which should have been placed in group two or three; and (8) only applications from groups two and three were forwarded to McElroy-Komppa for her consideration for the April 2006 position. Alternatively, Matthews maintains that McElroy-Komppa knew Matthews' race at the time

36

she evaluated the applications for the Turner position, and the fact that McElroy-Komppa lied about this is evidence she had something to hide; i.e., race discrimination.

Although the Court must consider the evidence and reasonable inferences from that evidence in the light most favorable to Matthews, "[i]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Vill. of Winnetka,* 371 F.3d 992, 1001 (7th Cir. 2004). According to Matthews, Rapp "refused" to refer Matthews' application while she forwarded other white applicants who lacked minimum qualifications. This contention is unsupported. Rapp's failure to forward Matthews' application resulted from Rapp's initial belief that Matthews did not meet the minimum qualifications for the position based on her understanding of Matthews' employment responsibilities as a Commercial Service Representative at Wisconsin Gas.

With respect to Matthews' contention that Rapp simultaneously referred numerous white applicants who lacked the minimum qualifications for the job, Matthews identifies three out of the 132 applications Rapp reviewed. There is no evidence that, when Rapp reviewed the applications, she believed that those applicants did not meet the minimum qualifications or that she referred those applicants based on their race. Rapp evaluated a total of 132 applications for the January ESS position, which based on information provided by those applicants who completed the AAP forms, included 43 African-American applicants. Of those 43, Rapp determined that the majority – 35 applicants (including Matthews) – met

37

the minimum qualifications. She referred those applications, along with the others, to Page for consideration.

Matthews also argues that Rapp lied about knowing the applicants' race. (Pl. Brf. 14.) (ECF No. 79.) However, the record discloses that, at her deposition, initially upon questioning about the AAP forms, Rapp responded that she believed she had not seen the forms. However, promptly, she corrected herself, testifying that she would have looked at the AAP form to note the code indicating how the applicant learned about the position.

Matthews argues that Rapp never forwarded her application and, even if it was forwarded, it was not timely or properly considered by Page. Matthews' contention lacks factual support in the record. Based on the timing of Gage's call to her, Page recalled thinking she might have to schedule another interview if Matthews' application qualified for group one placement. As a consequence, Page reviewed Matthews' application immediately upon receipt. If Matthews had met the requirements of group one, there was sufficient time to schedule an interview. Regardless of whether Matthews' application was placed in group two, three, or four, Matthews would not have been contacted for an interview because the process ended with the hiring of a group one applicant.

Matthews also maintains that Page was told that her application was initially determined not to meet the minimum qualifications. There is no evidence that Page handled Matthews' application differently or that the information relayed by Gage related in any way

38

to Matthews' race. Therefore, even if the information from Gage somehow put Matthews at a disadvantage, there is no evidence that it was because of her race.

Matthews also states that given her crucial role in the process Rapp can be characterized as a "cat's paw," citing *Ley v. Wis. Bell, Inc.*, 819 F.Supp.2d 864 (E.D. Wis. 2011), which held that when an employee performs an act motivated by discriminatory animus intended by that employee to cause an adverse employment action, and that act is a proximate cause of the ultimate employment action, the employer is liable. *Ley*, 819 F.Supp.2d at 870, (citing *Staub v. Proctor Hosp.*, 131 S.Ct. 1186 (2011)). The *Ley* court went on to note that in the Seventh Circuit "summary judgment is generally improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action." *Ley*, 819 F.Supp.2d at 871 (citing *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1459 (7th Cir. 1994)).

Rapp's role was limited in this case. There were no conversations between Rapp and Page as to applicant qualifications or recommendations for hire. Nor did Rapp have any involvement in the process after the applications were forwarded to Page for review. Rapp was not aware of—and did not take part in—the groupings of the candidates, selection of those to be interviewed, or the decision as to who to hire. Further, Page received Matthews' application and states that there was sufficient time to schedule another interview if necessary. Therefore, even if there was some delay in forwarding Matthews' application, it had no impact on Page's evaluation of her application or her decision as to whether an interview should be

39

scheduled. Despite construing the evidence, and the reasonable inferences from that evidence, in the light most favorable to Matthews, she has not presented evidence upon which a reasonable jury could find that Rapp was motivated by a discriminatory animus when she initially determined that Matthews did not meet the minimum qualifications, or that the initial determination or any delay was the proximate cause of the decision not to interview or hire her. Matthews' "cat's paw" claim fails.

Matthews also alleges that she was not properly considered for the April 2006 ESS position because only applications from groups two and three were forwarded for consideration. Matthews never formally applied for the April ESS position. Rather, her application, along with other applications from the January recruitment, was forwarded to McElroy-Komppa for consideration. The fact that the County used applications from the January recruitment along with newly submitted applications is unusual, and the exact process that was followed is unclear. However, all applications received for the two recruitments were identified on a list which was maintained by the County. The document clearly identified the applicants' names and whether the applicant met the minimum qualifications. (*See* Rapp Aff. ¶ 20, Ex. 6.) (ECF No. 66-6.) Although Matthews questions the veracity of this list and whether her application was referred, her efforts are speculative and without evidentiary support.

Applications which met the minimum qualifications were forwarded to McElroy-Komppa for consideration. McElroy-Komppa reviewed the applications and,

employing a different process than Page, selected a few applicants to schedule for interview. Turner, an African-American and a group three applicant from the January recruitment, was interviewed and hired for the position.

Matthews also suggests that McElroy-Komppa knew Matthews' race and, therefore, discriminated against her on that basis. Matthews has not presented any evidence to support this claim. While McElroy-Komppa was informed that a discrimination claim had been filed, there is no evidence that she had this knowledge at the time she evaluated the applications, or even knew what race the discrimination claim involved. Furthermore, two out of the three applicants interviewed for the April 2006 position and Turner, the eventual hire, were African-American.

Matthews also implies that she was never offered a recruitment card. However, Ware, not Rapp, was responsible for providing recruitment cards if applicants requested them. There is no evidence that Rapp played any role in providing recruitment cards or that she refused to provide a card to Matthews.

Matthews also relies on her contention that Rapp "lied" to her about the position being filled and discouraged her from applying in the future. That contention is disputed and cannot be resolved on summary judgment.

However, having considered the circumstantial evidence and the reasonable inferences from that evidence in the light most favorable to Matthews', the Court cannot conclude that a reasonable jury could find that it points directly to a discriminatory reason for

41

the employer's action. *See Koszola*, 385 F.3d at 1109. Therefore, Matthews has not presented sufficient evidence under the direct method of proof to overcome summary judgment,

Matthews also maintains that she can prevail under the indirect method whereby a Title VII plaintiff may show that she is the victim of racial discrimination by establishing a *prima facie case* of unlawful discrimination. A failure to hire claim requires the plaintiff to show that: (1) she is a member of a protected class; (2) she applied for an available position; (3) she was qualified for the position for which she applied; and (4) another person, not in the protected class, was offered the position or the position remained open. *Gore v. Ind. Univ.*, 416 F.3d 590, 592 (7th Cir. 2005). Once a plaintiff establishes a *prima facie* case, an inference of discrimination arises. *Id.* The burden then shifts to the defendant-employer to produce a legitimate, nondiscriminatory reason for the adverse employment action. *Farr v. St. Francis Hosp. and Health Ctrs.,* 570 F.3d 829, 833 (7th Cir. 2009). If the defendant-employer carries this burden, the plaintiff must show that the reason proffered by the employer was pretextual in nature. *Id*.

"In order 'to show pretext, a plaintiff must show that (1) the employer's non-discriminatory reason was dishonest and (2) the employer's true reason was based on a discriminatory intent.'" *Stockwell v. City of Harvey,* 597 F.3d 895, 901 (7th Cir. 2010) (citations omitted). If the plaintiff uses indirect evidence to meet his burden, she must show that the employer's reason is not credible or factually baseless. *Id*. at 901-02. The plaintiff also must provide evidence that supports the inference that the real reason was discriminatory.

42

*Id.* Indirect proof of pretext is permissible, but even if the County's decision was unreasonable, pretext does not exist if the decisionmaker honestly believed the nondiscriminatory reason. *See id.* at 902. This is because courts are not "superpersonnel department[s]" charged with determining best business practices. *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (quotation marks and citations omitted). Subjective evaluations of each candidate are entirely consistent with Title VII. *Id.* at 868.

There is no dispute that Matthews belongs to a racial minority or that she met the minimum qualifications for the ESS positions. Nor is there any dispute that she was not chosen for either position and the County selected another applicant from the pool of qualified candidates for both positions. With respect to the April 2006 ESS position filled by Turner, Matthews cannot establish a *prima facie* case because Turner is a member of the same protected class as Matthews.

However, with respect to the January 2006 position filled by Vetter, a White applicant, Matthews has established a *prima facie case*. However, the County has articulated legitimate non-discriminatory reasons for selecting Vetter to fill the January ESS position – it felt that she was the best qualified applicant because she had about seven years of recent and relevant work experience in California, her references were confirmed, and her recent evaluations were excellent. Vetter also demonstrated knowledge of program policy, computer proficiency, and understood the value of customer service. With her knowledge of California programs, the County believed that she would be able to handle a caseload sooner than a

43

person without previous economic support experience. Matthews has not presented any evidence upon which a jury could reasonably conclude that the County's reason for selecting Vetter was a lie. *See Stockwell*, 597 F.3d at 901. Therefore, Matthews cannot overcome summary judgment on her race discrimination claims relating to the January or April 2006 ESS positions under the indirect method of proof.

Matthews also maintains that she can prevail on a disparate treatment pattern and practice claim. To demonstrate a pattern or practice of discrimination, a plaintiff must show that race discrimination was the employer's "standard operating procedure—the regular rather than the unusual practice." *Adams*, 231 F.3d at 422. In order to establish a pattern and practice of discrimination, a plaintiff must prove more than the mere occurrence of isolated or "accidental" or sporadic discriminatory acts." *Int'l Bdh. of Teamsters v. United States,* 431 U.S. 324, 336 (1977).

A *prima facie* case for a pattern and practice of disparate treatment can be established by statistical evidence demonstrating substantial disparities in the application of employment actions as to minorities, buttressed by evidence of general policies or specific instances of discrimination. *Chi. Miniature Lamp Works*, 947 F.2d at 297. However, statistical evidence, by itself, can support a finding of a pattern and practice of discrimination. *O & G Spring*, 38 F.3d at 876. Although it is clear that the same set of facts can support both theories of liability, it is important to treat each model separately because each has its own theoretical underpinnings.

44

The disparate treatment model is based most directly on Title VII's statutory language and requires an inquiry into the defendant's state of mind. *Chi. Miniature Lamp Works*, 947 F.2d at 297. A defendant is liable under this model when the plaintiff can prove that the defendant subjectively intended to discriminate against the plaintiff on account of a protected trait. *Teamsters,* 431 U.S. at 335 n.15.

Whether considered alone or with the mosaic of other circumstantial evidence[15] relied upon by Matthews, the statistical evidence is not sufficient to allow a reasonable jury to conclude that the Defendants systematically intended to discriminate against African-Americans. Gray compared the Milwaukee-Waukesha, Wisconsin PMSA with the racial make-up of the Waukesha County workforce in 2005 and found a statistically significant disparity for hiring in six out of eight categories. The two categories in which there was no statistical difference are not relevant to Matthews' claims. Despite construing the statistical evidence in the light most favorable to Matthews, the probative value of Gray's statistical analysis is limited because of its broad scope. The African-American availability rates that Gray used to prepare her workforce analysis are not reflective of the racial composition of workers who are interested in and qualified for County jobs. And Gray's study does not

---

[15]Statistical analysis is relevant in the technical sense that it "has any tendency to make [the existence of a material] fact more or less probable than it would be without the evidence." Fed. R. Evid. 401. But data showing a small increase in the probability of discrimination cannot by itself get a plaintiff over the more-likely-than-not threshold; it must be coupled with other evidence, which does most of the work. *Baylie v. Fed. Reserve Bank of Chi.*, 476 F.3d 522, 524 (7th Cir. 2007). See also, *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 782 (7th Cir. 2007) ("a plaintiff may use pattern evidence of disparate treatment even if that evidence is not rigorously statistical, although, standing alone, it is insufficient evidence to withstand summary judgment"); *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 559 (7th Cir. 2007) (noting the importance of further analysis and context when relying on raw data in employment discrimination disputes).

address the County's hiring practices, as opposed to the general hiring practices within Waukesha County by all employers.

Matthews maintains that this action is analogous to *Carpenter v. Stephen F. Austin State Univ.,* 706 F.2d 608, 625 (5th Cir. 1983). *Carpenter* was an appeal from a judgment in a class action that granted injunctive relief to mitigate the effects of channeling African-American and female employees into lower paid clerical and custodial positions. At trial the plaintiffs pursued a disparate treatment theory for the channeling claim, which requires proof of discriminatory intent. Both sides presented statistical evidence regarding the University's employment practices. Generally, a difference of two or three standard deviations supports the inference that unlawful discrimination was a reason for the discrepancy. *Id*. at 624. The district court found that the standard deviation for hiring African-Americans to service/maintenance positions for the years 1972 to 1979 always exceeded two, and more frequently approximated six. *Id*. In upholding the injunctive relief ordered by the district court, the court of appeals noted that stratification through over-representation of protected groups in the workforce is actionable under Title VII if it results in decreased employment opportunities, and that the court's finding of stratification was "bolstered" by the subjectivity of the employment decisions because a central personnel office screened applications and made referrals. The educational and experience qualifications for certain positions were not validated or were waived for some white applicants. The supervisors had discretion to select employees without the benefit of formal guidelines.

46

The analogy fails in this case because, unlike the plaintiff class in *Carpenter,* Matthews has presented weak statistical evidence that cannot be adequately bolstered by any similar evidence of flaws in the County's screening process. Additionally, evidence of subsequent disagreement – five years later – as to the proper grouping or analysis of a few applications later is insufficient to show a pattern and practice of discrimination.

Matthews also refers to the DOJ investigation into Waukesha County's hiring practices. However, the investigation, initiated in 2010, did not concern Matthews or the ESS position. The investigation focused on the Sheriff's Department, Maintenance Mechanics and Telecommunicators. Thus, despite construing the evidence and the reasonable evidence in the light most favorable to Matthews, no reasonable jury could find for her on the disparate treatment pattern and practice claim. Therefore, her disparate treatment pattern and practice claim is subject to dismissal on summary judgment. Based on the foregoing, the Defendants' amended motion for summary judgment dismissing this action is granted.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

The Defendants' motion to strike the declarations of Matthews, Graves and Wilson (ECF No. 92) is **GRANTED** as to portions of paragraphs 38 through 61, and paragraphs 112 and 139 of Matthews' declaration, and exhibits 4, 7, 27, 28, and 32 to that declaration and **DENIED** in all other respects;

The Defendants' motion to strike Gray (ECF No. 89) is **DENIED**;

47

The Defendants' amended motion for summary judgment (ECF No. 75) dismissing Matthews' race discrimination claims is **GRANTED** and this action is **DISMISSED**;

Pursuant to Fed. R. Civ. P. 54(d), the Defendants are **AWARDED** costs; and

The Clerk of Court is **DIRECTED TO ENTER** judgment accordingly.

Dated at Milwaukee, Wisconsin this 28th day of March, 2013.

**BY THE COURT**

**Hon. Rudolph T. Randa**
**U.S. District Judge**

48